**In re Linda SIMS, Debtor.**

**Bankruptcy No. 95–41390.**

United States Bankruptcy Court,
N.D. Alabama,
Eastern Division.

Aug. 30, 1995.

S. Keith Eady, Talladega, AL, for defendant/debtor.

Leon F. Kelly, Jr., Birmingham, AL, for Rural Housing and Community Development Service.

Harry P. Long, for the Standing Trustee Mavis Willingham.

## Memorandum Opinion

JAMES S. SLEDGE, Bankruptcy Judge.

This case presents the issue of the extent to which a Chapter 13 debtor may cure a pre-petition default on indebtedness secured by her principal residence—in particular, whether she may set aside a pre-petition foreclosure sale, reinstate the mortgage, decelerate the indebtedness (accelerated under the terms of the indebtedness), and resume payments under the pre-default terms of the contract.

Two bankruptcy courts in Alabama have addressed this issue and have reached different answers. *In re McKinney,* 174 B.R. 330 (Bankr.S.D.Ala.1994); *In re Ragsdale,* 155 B.R. 578 (Bankr.N.D.Ala.1993). Both decisions, however, applied relevant sections of the Bankruptcy Code prior to the effective date of the 1994 amendments. This Court must consider the new law.

On July 20, 1995, the Court held a hearing at Talladega, Alabama, on a motion for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and a motion for summary judgment thereon under Fed.R.Bankr.P. 7056 and 9014, both filed by the United States Department of Agriculture, Rural Housing and Community Development Service ("RHCDS"), formerly Farmers Home Administration. RHCDS's attorney, the debtor's attorney, and the standing trustee appeared before the Court. The parties presented oral arguments in support of their respective positions. At the conclusion of the hearing the Court directed the parties to submit written memoranda setting forth the legal authorities for their respective positions. By August 3, 1995, RHCDS, the debtor, and the standing trustee had submitted briefs in support of their respective positions. The Court took the matter under submission on said date.

## Findings of Fact

Upon consideration of the motions, the statements of the respective parties at the hearing, the briefs filed by the respective parties, and the case file, the Court finds the facts to be as follows:

1. On April 30, 1980, RHCDS loaned the debtor the amount of $26,500.00, to enable the debtor to buy real property in Talladega County, Alabama. RHCDS held a valid mortgage, executed by the debtor on the same date, on the real property, which constituted the debtor's principal residence. The indebtedness was also secured by "the rents, issues, and profits thereof and revenues and income therefrom, all improvements and personal property now or later attached thereto or reasonably necessary to the use thereof, including, but not limited to, ranges, refrigerators, clothes washers, clothes dryers, or carpeting." *See* Movant's Exhibit 2, attached to motion to lift stay.

2. After making the payments for approximately 12 years, the debtor defaulted. On July 14, 1993, the local RHCDS County Supervisor completed a "Report on Real Estate Problem Case" recommending foreclosure of the debtor's account, and the report reflected that the debtor was approximately 17 months delinquent at that time.

3. On July 27, 1993, RHCDS accelerated the payments under the note pursuant to its terms. RHCDS notified the debtor of her right to appeal the decision to accelerate; however, the debtor failed to do so.

4. RHCDS conducted a properly noticed foreclosure sale, sold the real property on May 19, 1995, to RHCDS as purchaser, and recorded the foreclosure deed on June 9, 1995.

5. The debtor filed this Chapter 13 proceeding on June 16, 1995. The debtor listed RHCDS on Schedule D as holding a secured claim in the amount of $30,-000.00, secured by a house, lot, stove, refrigerator, washer, and dryer. The debtor valued her interest in the collateral on Schedule A at $31,200.00, without

subtracting any secured claim or exemption.

6. The plan provides that the debtor is 24 months in arrears to RHCDS and owes RHCDS a total arrearage of $5,424.00. The plan also provides that the trustee will make sixty monthly payments to RHCDS in the amount of $109.98, which will cure the arrearage. The trustee will begin making regular monthly mortgage payments to RHCDS in the amount of $226.00 on July 1, 1995.

7. On June 28, 1995, RHCDS filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d)(1), asserting that, because there was a pre-petition foreclosure sale, the debtor's right to cure the default had lapsed pursuant to 11 U.S.C. § 1322(c)(1). On the same date, RHCDS filed a motion for summary judgment on its motion for relief from the stay.

8. On July 3, 1995, the debtor filed an objection to RHCDS's motion for relief from the stay. Because the debtor filed an objection, the court scheduled the hearing on July 20, 1995.

### Discussion and Conclusions of Law

The issue presented is whether the language of 11 U.S.C. § 1322, as amended by Section 301 of the Bankruptcy Reform Act of 1994, P.L. No. 103–394, 108 Stat. 4106 (the "Reform Act"), precludes the debtor, following the foreclosure sale of real property used as her principal residence, from using post-foreclosure chapter 13 proceedings as a vehicle to set aside the foreclosure and sale, reinstate the mortgage, decelerate the indebtedness, and resume payments according to the mortgage contract's pre-default terms.[1] Section 301 of the Reform Act made two changes in Section 1322. The Reform Act moved old subsection (c) to (d) and created a new subsection (c) incorporating the changes. New subsection (c) provides as follows:

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law; and

(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. § 1322(c)(1994).

■ Subsection (c)(2) is not applicable to the case at bar. Under Subsection (c)(2), certain mortgages can be modified and provided for in Section 1325(a)(5). As a Chapter 13 plan may not extend beyond five years, this subsection applies only to those cases involving "short-term mortgages, long-term mortgages on which the debtor has nearly completed payment, and mortgages with balloon payments." *In re Escue*, 184 B.R. 287, 293 (Bankr.M.D.Tenn.1995). *See also In re Eason*, 181 B.R. 127, 132–134 (Bankr. N.D.Ala.1995) (a pre-Reform Act case). Subsection (c)(2) applies by its own language only to mortgages in which the last payment is due before the date of final of payment of the plan and at least one court has found that it is also "intended for debtors to be able to cure "stub" or "short-term" mortgages which mature or balloon prior to filing of the petition." *Escue*, 184 B.R. at 292. It does not apply to a case such as this where there has been a pre-petition default, acceleration, foreclosure sale, and recordation of the foreclosure deed. *See e.g., In re Ragsdale*, 155 B.R. 578, 587 (Bankr.N.D.Ala.1993) (a pre-Reform Act case "approv[ing] of the view

---

1. The case at bar was filed on June 16, 1995; therefore, the amendments to the Bankruptcy Code made by the Reform Act apply to this case. Section 301 of the Reform Act applies only to cases filed on or after October 22, 1994, the date President Clinton signed the bill into law. The

Reform Act generally only applies to cases filed on or after that date. There are four exceptions to this general rule. However, Section 301 does not fall within an exception. *See* Sections 702, 111, 113, 201 and 305 of the Reform Act.

that the 'last payment' language in Section 1322(b)(5) refers to the date of the last payment of the original note rather than the date the accelerated debt is due.") This Court finds that the words "last payment" in the phrase "last payment on the original payment schedule" means exactly the same as the words "last payment" in (b)(5) as they are interpreted by Chief Judge Mitchell. This conclusion is supported by the general rule of statutory construction that where the "same words are used in different parts of an act, and where the meaning in one instance is clear, other uses of the word in the act have the same meaning as that where the definition is clear." *In re Chalk Line Manufacturing, Inc.*, 181 B.R. 605, 609 (Bankr. N.D.Ala.1995) (citing *In re Missionary Baptist Foundation of America, Inc.*, 667 F.2d 1244, 1245 (5th Cir.1982) (citations omitted)). In the case at bar, the last payment of the mortgage was not due before the final payment of the plan and the mortgage did not mature or balloon prior to the filing of the petition. Section 1322(c)(2), therefore, is not applicable.

The Section pertinent to the Court's analysis is Section 1322(c)(1). The issue presented is whether the debtor's treatment, in the plan, of RHCDS's claim is permissible in light of the new subsection. The Court notes at the outset that to date there are no reported cases which have thoroughly analyzed the effect of newly-enacted Subsection (c)(1). This matter is one of first impression for this Court.

In order to analyze the effect of Subsection (c)(1), the Court must consider its interaction with the relevant paragraphs of Section 1322(b) which are unmodified by the Reform Act. The other relevant portions of that section provide:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> .    .    .    .    .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal resi-

dence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

> (3) provide for the curing or waiving of any default;
>
> .    .    .    .    .
>
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;
>
> .    .    .    .    .

11 U.S.C. § 1322(b).

However, before analyzing the effect of newly-enacted Section 1322(c)(1) on Paragraphs (2), (3), and (5) of Section 1322(b), the Court will examine these provisions and the law prior to the Reform Act.

### I. Pre–Reform Act Law

Paragraphs (2), (3), and (5) of Section 1322(b) must be read together as they govern what a debtor who has defaulted on mortgage payments can do to save her home. However, interpreting these provisions consistently as a unit is trying. *See* 5 Norton Bankruptcy Law and Practice 2d § 121:6, at p. 97 (Supp.1995) (The editors recognize that "[i]nterpreting these sections [sic] consistently as a unit is very difficult and has generated much confusion and a great deal of conflicting case law."). Section 1322(b)(2) allows the plan to modify the rights of holders of secured claims, so long as the debt is not secured only by the debtor's principal residence. Assuming that the debtor has defaulted and a secured party holding an interest only in the principal residence has accelerated the entire amount due on the loan, subsection (b)(2), by negative implication, arguably prohibits the chapter 13 plan from providing for any "deceleration" which would modify the acceleration rights of the secured party.[2] Section 1322(b)(3) provides, however,

---

2. The debtor asserts that the prohibition of subsection (b)(2) does not apply in the case at bar. Debtor's brief at p. 1. The debtor asserts that

since the mortgage has language apparently granting a security interest in items other than

for the curing or waiving of any default. Subsection (b)(5) similarly provides for the curing of defaults and specifically states that such a cure is available "notwithstanding paragraph (2)". Subsection (b)(2) gives the debtor the right to lower contract payments to secured creditors. As Subsection (b)(3) allows the debtor to cure defaults and Paragraph (5) provides the mechanism for the cure (payment of the arrearage in a reasonable amount of time), those two subsections are authority for deceleration. A trend developed in the case law which permitted this conclusion, so long as the debtor still retains a property interest in the real estate under state law. *See* 5 Norton Bankruptcy Law and Practice 2d § 121:6, at p. 99 (Supp.1995) (citations omitted). RHCDS does not dispute this conclusion, so long as the foreclosure has not occurred.

■ However, considerable debate occurred nationally over the critical point during the pre-petition foreclosure process when a debtor could no longer reinstate and cure a mortgage under 11 U.S.C. Section 1322(b)(2), (3) or (5). *E.g., In re Ragsdale,* 155 B.R. 578, 581–582 (Bankr.N.D.Ala.1993) (Chief Judge Mitchell collects and cites cases from each Circuit which has dealt with this issue.). The difficulty is that state law determines when the interest of a mortgagor is terminated. *See In re McKinney,* 174 B.R. 330, 333 (Bankr.S.D.Ala.1994) ("There is no federal foreclosure law and therefore the court's starting point in determining a mortgagor's status vis á vis a foreclosed mortgage is state

law.... Alabama foreclosure law controls the rights of mortgagors and mortgagees unless clearly and manifestly displaced by federal law."). *See also Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

In some states, the mortgagor's interest terminates on the date of entry of a judgment of foreclosure, while in other states it terminates upon the expiration of the redemption right prior to foreclosure. In still other states, the mortgagor's interest terminates at the time of the foreclosure sale. Some states, however, permit a right of redemption following the foreclosure sale. Depending on state law, many courts have held that the debt cannot be decelerated nor the arrearage cured after the foreclosure sale. *Federal Land Bank of Louisville v. Glenn (In re Glenn),* 760 F.2d 1428 (6th Cir.1985); *Oregon v. Hurt (In re Hurt),* 158 B.R. 154 (9th Cir. BAP 1993); *In re Gordon,* 161 B.R. 459 (Bankr.E.D.Ark.1993); *Leggett v. Morgan (In re Morgan),* 115 B.R. 399 (Bankr. M.D.Ga.1990); *In re Westmore,* 75 B.R. 110 (Bankr.N.D.Fla.1987).

Likewise, in the State of Alabama, considerable debate over this issue has occurred and two divergent lines of authority have developed. *See* M. Donald Davis, Jr., *Real*

---

the real property, the debt is not secured only by the debtor's principal residence.

The Court does not necessarily agree with the debtor that (b)(2) does not apply and makes no finding either way. The debtor offers no legal basis for this conclusion other than the language of (b)(2) itself. Upon independent research of the issue of whether certain items constitute additional collateral, the Court finds that this very issue has led to considerable amount of debate. *See* David J. Jesulaitis, *Lien Stripping After Nobleman v. American Savings Bank: What is "Additional collateral"?,* 32 Hous.L.Rev. 201 (Summer 1995). This issue has not been addressed by the Eleventh Circuit and the lower court decisions are not consistent. *See In re Ireland,* 137 B.R. 65 (Bankr.M.D.Fla.1992) and *In re Stiles,* 74 B.R. 708 (Bankr.N.D.Ala.1987). The leading case on what constitutes additional collateral is *Resolution Trust Corp. v. Washington (In re Washing-*

*ton),* 967 F.2d 173 (5th Cir.1992) (footnote five collects numerous cases dealing with the issue). However, this case discussed the question of whether insurance is additional security and did not address additional items which appear to be fixtures.

Regardless whether Subsection (b)(2) applies to the case at bar, Subsections (b)(3) and (b)(5) permit the debtor to cure; Subsection (b)(2) does not limit the right to cure under these sections. The limitation in Section 1322(c)(1), on the right to cure under Subsections (b)(3) and (b)(5), is expressly not effected by the applicability or non-applicability of (b)(2). Section 1322(c) begins by stating "[n]otwithstanding subsection (b)(2) ..." Thus, the application of Subsection (b)(2) is of no legal significance in the case at bar. However, reviewing that subsection is necessary in order to fully analyze Section 1322.

*Estate Mortgages and Chapter 13 Bankruptcy Practice in Alabama—Current Overview and Practice Suggestions,* 52 Ala. Lawyer 174, 175 (May 1995); Brannon D. Anthony, *Stream of Commerce,* Winter Ed. 1995, p. 3. The courts agree that at some point in the foreclosure process the default can no longer be cured; however the courts disagree as to the point in time at which the right to cure ends under 11 U.S.C. Section 1322(b). For the sake of classification, the two views will be called by the case name which clearly sets forth the analysis for each particular view in Alabama, i.e., the *Ragsdale* analysis and the *McKinney* analysis.

### A. Ragsdale Analysis

Chief Judge Mitchell concluded that cure is available until a debtor is completely divested of all rights in property. *In re Ragsdale,* 155 B.R. 578, 586 (Bankr.N.D.Ala.1993). *See also Commercial Federal Mortgage Corporation v. Smith,* 170 B.R. 708 (N.D.Ala. 1994) (Judge Hancock expressly adopts the analysis and holding of *Ragsdale* ), appeal docketed, No. 94–6802 (11th Cir. Aug. 26, 1994); *Fleet Mortgage Corporation v. Shaw,* 171 B.R. 129 (N.D.Ala.1994) (Judge Hancock again expressly adopts his holding in *Smith* and thus the analysis and holding of *Ragsdale.*), appeal docketed, No. 94–6803 (11th Cir. Aug. 26, 1994). This Court is aware that many practitioners, some commentators, and even some courts summarize the holding of *Ragsdale* as merely attaching a broad definition to when a foreclosure sale is complete. However, a careful reading of *Ragsdale* shows that Chief Judge Mitchell based her finding that the debtor may cure on the property rights the debtor has at the time the petition was filed. The debtor's existing interest in the property and not the "foreclosure sale" controls when the right to cure under Section 1322 is available.

**3.** Section 6–5–248 of Alabama Code (1975) provides in pertinent part:
    (a) Where real estate, or any interest therein, is sold the same may be redeemed by:
    (1) Any debtor, including any surety or guarantor.

    .    .    .    .    .

    (b) All persons named or enumerated in subdivision (a)(1) through (a)(7) may exercise the

The statutory right of redemption, under Alabama Code Section 6–5–248(b) (1975)[3], is an interest in property that survives the filing of the petition and becomes property of the estate. 11 U.S.C. § 541(a)(1); *In re Ragsdale,* 155 B.R. at 585 (citing *In re Saylors,* 869 F.2d 1434 (11th Cir.1989) (citing *Wragg v. Federal Land Bank of New Orleans,* 317 U.S. 325, 63 S.Ct. 273, 87 L.Ed. 300 (1943)). Judge Hancock, in *Commercial Federal Mortgage Corporation v. Smith,* 170 B.R. 708 (hereinafter *Smith* ), adopted the holding of *Ragsdale* and summarized the ruling as follows:

> [T]he Bankruptcy Court found that the event which terminates a debtor's right to cure under Section 1322 was *not the foreclosure sale but rather the expiration of the statutory right of redemption.* The Bankruptcy Court reasoned that this date was consistent with the compromise inherent in Section 1322 between preserving the options of the bankrupt debtor and protecting the health of the home mortgage industry. The Bankruptcy Court reasoned that allowing a debtor to utilize Chapter 13 to cure the default on his mortgage, keep his home and eventually pay the debt he owed would not undermine the home mortgage industry in that "mortgage lenders are generally not interested in owning property but rather in collecting money."

*Smith,* 170 B.R. at 710. (emphasis added).

Chief Judge Mitchell focused the analysis on when property rights are lost by the debtor to determine when the right to cure under Section 1322(b)(3) expires. She did not focus on an arbitrary "cut off" date for the right to cure, such as the date of the actual "foreclosure sale." Chief Judge Mitchell concluded that

> right of redemption granted by this article within one year from the date of the sale.

no difference exists between a debtor in default and a debtor whose mortgage has been foreclosed but who holds a right of redemption. And if a debtor in default may cure by reversing the effects of acceleration of his mortgage and maintaining payments pursuant to the terms of the original contract, so may a debtor whose mortgage has been foreclosed.

*In re Ragsdale*, 155 B.R. at 586 (citing *Wright v. Union Central Life Ins Co.*, 304 U.S. 502, 514–15, 58 S.Ct. 1025, 1032, 82 L.Ed. 1490 (1938)).

A focus on existing property rights and interests under state law is consistent with Section 541(a), which defines the estate to be "comprised of all of the following property ...: (1) ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). A statutory right of redemption is a property right that becomes property of the estate.[4]

Chief Judge Mitchell continued in an apparent attempt to address those courts which simply focus on the date of the foreclosure sale as the "cut off" date of the right to cure without any analysis of state property rights, and reasoned that the foreclosure sale is not complete as long as the debtor has the statutory right of redemption. "A sale should not be considered completed until legal title has fully vested in the purchaser at a foreclosure sale and is not subject to any contingency." *Id.*, at 587. The debtor becomes completely divested of all rights and, therefore, loses the ability to cure the default under Section 1322(b)(3) only after the redemption period expires. Under Chief Judge Mitchell's analysis, even if a court were to look solely to the "competition of sale" principle as the bench mark for the right to cure, without expressly considering the property rights of the debtor, as long as there is some property right of the debtor, e.g., the statutory right of redemption, the sale cannot be construed as complete under state law.

## B. McKinney Analysis

In the case of *In re McKinney*, 174 B.R. 330 (Bankr.S.D.Ala.1994), Judge Mahoney reached a different conclusion from an application of Alabama law. She applied a "bright line" test based on the timing of the foreclosure sale for determining when the right to cure passes. Judge Mahoney focused on the foreclosure sale as the "cut off" date for the right to cure under Section 1322(b). In so doing, Judge Mahoney expressly rejected Judge Mitchell's analysis. *Id.*, at 337. Judge Mahoney summed up the *Ragsdale* holding as follows:

> The court applied a "completion of sale" concept to determine when a debtor no longer can cure mortgage default. The *Ragsdale* court determined that completion of sale, "the time at which the debtor has been wholly divested of any rights in the property," is the "point at which cure becomes unavailable."

*Id.*, at 337.

This synopsis of the holding is not correct because it focuses on the "completion of sale" as the crux of the *Ragsdale* analysis. This focus is misplaced. Chief Judge Mitchell's analysis of the right to cure is not based on when the sale is complete. Rather, it focused on the divestiture of property rights, i.e., the passage of the right to redeem, as the point at which cure becomes unavailable. So long as state law interests in property remain in the debtor, Section 1322 authorizes cure of those interests.

Perhaps if the court in *Ragsdale* had simply stated that "the time at which the debtor has been wholly divested of any rights in property is the point at which cure becomes unavailable" the opinion would have been clearer. However, Chief Judge Mitchell had the enormous task of attempting to find a "common thread" in analyzing the scores of cases which have analyzed when the debtor's right to cure terminates. *In re Ragsdale*, 155 B.R. at 581–585, 586. The common thread was the "completion of sale" principle. *Id.*, at 586. It was only after Chief Judge

---

4. Code of Alabama (1975) Section 6–5–250 characterizes the statutory right of redemption as a mere personal privilege and not a property right. Nevertheless, it is an interest in property within the broad definition of Section 541. *Wragg v. Federal Land Bank*, 317 U.S. 325, 63 S.Ct. 273, 87 L.Ed. 300 (1943); *In re Saylors*, 869 F.2d 1434 (11th Cir.1989).

Mitchell thoroughly discussed the basis for allowing a debtor to pay the pre-petition arrearage through the trustee and maintain payments under the original contract that she discussed the "completion of sale" principle under Alabama law. *In re Ragsdale*, 155 B.R. at 586 ("Aside from the previously mentioned reasons justifying cure of a foreclosed mortgage is the ... 'completion of sale' principle."). As the great majority of courts discussing the termination date focus on timing of the "foreclosure sale," it was incumbent on the *Ragsdale* court to address the concept of the "completion of sale" under Alabama law. The language construing the completion of a foreclosure sale as not complete until the running of the statutory redemption period in Alabama is additional support for the holding of *Ragsdale*.

Judge Hancock, in *Smith* and *Shaw*, did not discuss the "completion of sale" principle. Rather, Judge Hancock adopted *Ragsdale* and in so doing underscored that the "statutory right of redemption is a property right within the jurisdiction of the bankruptcy courts." *Smith*, 170 B.R. at 710. The district court recognized that to hold a

> foreclosure sale [as] the ultimate "cut-off" date on which the statuary right of redemption is lost ... would work unnecessary hardship on the debtor ... [and does not undermine] the investment potential of the home mortgage industry ... [and the] holding of *Ragsdale* allowed Alabama state redemption laws to be utilized by the debtor through his confirmed Chapter 13 plan.

*Id.*, at 711.

The *McKinney* decision narrowly characterizes the right to cure to limit payments to the lump sum required for state law redemption. *McKinney* would not change the state law procedure for exercising a right of redemption absent a manifest indication of such result in the statute. Chapter 13 should not provide any alternative for exercising the statutory right of redemption, which requires a lump sum payment of principal, interest, and other charges. *McKinney* at 336.

5. "The Court is not suggesting, for example, that a Chapter 13 plan may be used to rewrite the contract that existed between the parties and allow the debtor to pay less than what the terms

As reviewed earlier, the challenge is to interpret Section 1322(b)(2), (3) and (5) as a consistent unit. Section 1322(b)(2) protects a home mortgage lenders' rights from modification. This limitation is itself modified by the cure provisions of paragraphs (3) and (5). A right to accelerate may be modified. *In re Terry*, 780 F.2d 894 (11th Cir.1985). Indeed, RHCDS does not dispute this conclusion until the foreclosure sale occurs. *Ragsdale* notes:

> While it is true that the power of foreclosure is a vital part of the lender's security, it is also true that mortgage lenders are generally not interested in owning property but rather in collecting money. Allowing debtors every opportunity to achieve their goal of home ownership and to simultaneously achieve the monetary objectives of the lender, so long as the lender's position is protected and not at risk of loss, will result in the best compromise consistent with the provisions of Chapter 13.[5]

*Ragsdale*, supra, at 583.

The most critical conclusion in *McKinney* is that the statutory right of redemption cannot be cured in a Chapter 13 plan. *Ragsdale* also characterized this analysis as the most critical as follows:

> This leads to the ultimate question: If a statutory right of redemption may be exercised in a Chapter 13 plan, must it be exercised strictly by the terms of state law, which would require the entire debt to be paid within one year, or may the right of redemption be used to bring the debtor's interest into the Chapter 13 plan, where it may be dealt with as an accelerated debt? This Court believes the latter is true, and holds that where a debtor files a Chapter 13 petition following a foreclosure sale of his residence, he may pay the pre-foreclosure sale arrearage through the Chapter 13 trustee, while maintaining payments under the terms of the original contract.

> The Court believes this is the proper holding for several reasons. First, the

of the contract demand. Under the system that the Court envisions, the home mortgage lender will get exactly what it has bargained for in the same amount of time." *Ragsdale*, at 583 n. 2.

concept of curing a default, as used in Section 1322, means "taking care of the triggering event and returning to pre-default conditions." [*In re*] *Taddeo*, 685 F.2d [24] at 26–27 [2nd Cir.1982]. *Taddeo* notes that a default causes certain consequences. Although in the context of that case the consequence was acceleration of the debtor's mortgage, it cannot be successfully argued that foreclosure is not a "consequence of default." Under the *Taddeo* reasoning, then, a foreclosure may be nullified. The cases that hold that cure is not allowed after a foreclosure sale essentially modify the plain language of Section 1322(b)(5) to make it read that a Chapter 13 plan may "provide for the curing of any default unless a foreclosure has taken place." That language cannot be imputed to the statute, which clearly states that a debtor may cure any default. [This language is precisely what Congress added in Reform Act, Section 301, inserting new Section 1322(c)(1).] Whatever consequences the default may have triggered are meaningless; the default still exists and may be cured pursuant to a Chapter 13 plan. To hold otherwise fails to provide a debtor every opportunity to reorganize under Chapter 13 and to provide for all of his debts.

The second reason the Court believes cure may be allowed even after a foreclosure sale has occurred but when a statutory period of redemption remains is the decision of the Supreme Court in *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938). In that case, the Supreme Court, construing a provision of the former Bankruptcy Act that allowed debtors to maintain their residences, found absolutely no distinction between a debtor in default and a debtor holding a right of statutory redemption.

While there may be no relation of debtor and creditor between the bankrupt and the purchaser of his property at a judicial sale, we think the purchaser at a judicial sale does enter into the radius of the bankruptcy power over debts.... The debtor has a right of redemption of which the purchaser is advised, and until that right of redemption expires the rights of the purchaser are subject to the power of Congress over the relationship of debtor and creditor and its power to legislate for the rehabilitation of the debtor. The person whose land has been sold at foreclosure sale and now holds a right of redemption is, for all practical purposes, in the same debt situation as an ordinary mortgagor in default; both are faced with the same ultimate prospect, either of paying a sum certain of money, or of being completely divested of their land.

Id. at 514–15, 58 S.Ct. at 1032.

According to this passage, no difference exists between a debtor in default and a debtor whose mortgage has been foreclosed but who holds a right of redemption. And if a debtor in default may cure by reversing the effects of acceleration of his mortgage and maintaining payments pursuant to the terms of the original contract, so may a debtor whose mortgage has been foreclosed.

*Ragsdale* at 586. *McKinney* states that foreclosure bars a cure because it merges the legal and equitable title to the property in the purchaser, and the mortgagee thereafter has no claim to be cured. In addition to being rejected by the *Ragsdale* court for the reasons quoted above, this argument was rejected by the Third Circuit in *In re Johns*, 37 F.3d 1021 (3d Cir.1994).

Judge Hancock pointed out that the Eleventh Circuit, in *Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle)*, 12 F.3d 1008 (11th Cir.1994), clearly espoused the strong desire of Congress to allow debtors to keep their homes. *Smith*, at 711. In *Hoggle*, a confirmed Chapter 13 plan paid the lender who financed the debtor's residential mobile home by maintaining the current obligations through direct payments from the debtor and by curing the prepetition defaults through payments from the trustee, pursuant to Section 1322(b)(5). After confirmation, the debtor defaulted on current payments to the lender. The lender then moved for relief from the automatic stay and the debtor modified the plan to cure the post-confirmation defaults through payments from the trustee. The modified plan was not disapproved un-

der § 1329 and the motion for relief was denied because Section 1322(b)(5) permits a plan to cure *any* default, including those occurring post-confirmation. The modified plan still required the debtor to maintain current payments. The Eleventh Circuit reasoned that the legislative intent is for Chapter 13 plans to be flexible, including modifications required by unforeseen problems. "Reading the statutory scheme to permit the cure of any defaults . . . falls within the letter and spirit of the statutory scheme, according the flexibility Congress intended for homeowners in proposing the modifying their Chapter 13 plans." *In re Hoggle,* 12 F.3d at 1010. *See In re Hart,* 184 B.R. 849 (Bankr.M.D.Fla.1995). The *McKinney* analysis, which restricts cure to the method prescribed in State law of a lump sum payment of principal, interest, and other charges is contrary to public policy and legislative intent in chapter 13 articulated by the Eleventh Circuit, and the relief of cure provided in Section 1322(b)(3) and (5). It is an anomalous situation if the debtor gives up one of the most important rights provided by the states to owners of real property, the right of redemption, when she files for protection under the federal bankruptcy laws. *Ragsdale* at 585.

## II. Post Reform Act and Section 1322(c)(1)

This Court is persuaded that the *Ragsdale* analysis is the correct analysis of the law prior to the Reform Act. Chief Judge Mitchell's analysis and Judge Hancock's adoption of such analysis are in accord with the strong public policy of the Bankruptcy Code of allowing debtors to keep their homes and truly obtain a chance at a fresh start. The *Ragsdale, Smith,* and *Shaw* decisions were based on the law as it stood prior to the Reform Act without the benefit of newly added subsection 1322(c)(1). The Court finds, however, that the Reform Act has, in effect, codified the holding of *In re McKinney* and those cases like it which adopt a "bright line" test to cut off the right to cure, rather than carefully protect and preserve the state law property rights of chapter 13 debtors reflected in the *Ragsdale, Smith* and *Shaw* decisions. These decisions are overruled by Section 301 of the Reform Act. Congress

has supplanted State property rights with a national standard.

As stated in the careful analysis of case law in *Ragsdale* and *McKinney,* many courts hold that a national standard is preferable. Indeed, *McKinney* establishes that *Ragsdale* is the minority view. A national standard facilitates interstate lending and promotes a uniform bankruptcy law. *McKinney* states:

> In *Grubbs v. Houston First Am. Savs. Ass'n,* 730 F.2d 236, 241–42 n. 9 (5th Cir. 1984), the court stated:
>
>> To permit for Chapter 13 purposes, the variations of the laws of different states to govern the effect of an acceleration and its curability would be to defeat one of Congress' important purposes in exercising its preemptive bankruptcy powers under the federal Constitution, to provide by Chapter 13 a uniform national remedy by which to adjust debts of individuals with regular incomes as an alternative to their being forced to undergo liquidating bankruptcy. Along with [the Second Circuit Court of Appeals] "we do not believe that Congress labored for five years over this controversial question only to remit consumer debtors— intended to be the primary beneficiaries of the new Code—to harsher mercies of state law."

> This Court believes that bankruptcy equity policies and state law interests are both served by recognizing the foreclosure sale as the end point of the cure and reinstatement rights of debtors. All Alabama debtors, by the time of a foreclosure sale, have had ample opportunity to avail themselves of the protection of Chapter 13.

*McKinney* at 336.

### A.

In order to interpret Section 1322(c)(1) the Court must begin with the language of the statute itself. If the statutory scheme is "coherent and consistent, there is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron Pair,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). *See also Estate of Cowart v. Nicklos Drilling*

Co., 505 U.S. 469, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (The court must give effect to the clear meaning of the statute as written); *Connecticut National Bank v. Germain,* 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (When the words of a statute are unambiguous, the first canon of construction—that the court must presume that the legislature says what it means in the statute—also becomes the last canon of construction; judicial inquiry at that point is complete.); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) ("[T]he meaning of a statute must, in the first instance be sought in the language in which the act is framed and if that is plain, ... the sole function of the courts is to enforce it according to its terms."). *See generally,* Peter H. Carroll, III, *Literalism: The United States Supreme Court's Methodology For Statutory Construction in Bankruptcy Cases,* 25 St. Mary's L.J. 143, 148 (1993). The Court should not look beyond the language of the statute unless a literal application of the statute produces "a result demonstrably at odds with the intentions of its drafter." *Ron Pair,* 489 U.S. at 242, 109

S.Ct. at 1031. *Accord, Ardestani v. I.N.S.,* 502 U.S. 129, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (There is a strong presumption that the plain language of a statute expresses congressional intent and that presumption is rebutted only in rare and exceptional circumstances); *In re Woodhaven, Ltd.,* 139 B.R. 745, 747 (Bankr.N.D.Ala.1992) (When the statute is plain, the Court does not consider legislative history.) (collecting United States Supreme Court cases).[6]

Section 1322(c)(1) states that "a default with respect to or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) **until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law.**" 11 U.S.C. Section 1322(c)(1) (1994) (emphasis added). This Court finds Subsection (c)(1) clear and unambiguous.[7] Subsection (c)(1) is a specific limitation on the exceptions provided in subsections (b)(3) and (b)(5) to the general prohibition against modifying the rights of a holder of a claim se-

**6.** Commentators have suggested the legislative history of the amendment establishes an interpretation of the amendment contrary to this Court. King, Collier on Bankruptcy, ¶ 1322.14A (1995). The Legislative History to Section 301 of Public Law 103–394 (H.R. 5116), The Bankruptcy Reform Act of 1994, states:

"This section of the bill safeguards a debtor's rights in a chapter 13 case by allowing the debtor to cure home mortgage defaults at least through completion of a foreclosure sale under applicable nonbankruptcy law. However, if the State provides the debtor more extensive 'cure' rights (through, for example, some later redemption period), the debtor would continue to enjoy such rights in bankruptcy."

If this history accurately reflects the intent of Congress, the statute was terribly drafted. RHCDS proposes a paraphrase of the legislative history to support the holding of this Court, as follows:

"Notwithstanding applicable State law, extinguishing the right to cure a default on a home mortgage prior to a foreclosure sale is contrary to the 'fresh start' principle and the previous rulings of all Federal Circuit Courts except *Roach.* Therefore, this bill is amended to clearly establish a debtor's *Federal* right under 11 U.S.C. § 1322 to cure home mortgage defaults through completion of a foreclosure sale. However, once the foreclosure sale occurs, the debtor continues to enjoy in his bankruptcy proceeding *only* those rights afforded him under *State* law—no more,

no less. Any state right to 'cure,' such as through a redemption period, must be exercised strictly in accord with State law."

This approach makes the Legislative History consistent with the language of the amendment and consistent with *McKinney.*

**7.** The debtor contends that the very fact that the language is in controversy leads to the conclusion that the language is ambiguous. Debtor's brief at p. 2. The Court does not agree with this theory. Every issue of statutory construction must begin with the Court determining whether the statute is ambiguous or not. Every question of statutory construction begins with a review of the plain language of the statute, and whether the statute is ambiguous is a question of law to be determined by the court. *Gollobin v. Air Distributing Co.,* 838 F.Supp. 255, 257 (E.D.Va. 1993). "Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses." Norman J. Singer, 2A *Sutherland Statutory Construction,* § 45.02 (5th Ed.1992). The debtor's contention that simply because two parties disagree about the meaning of a statute, the statute is therefore ambiguous is in effect the "carriage leading the horse." The Court must review the statute and then make such a finding. Upon review of the statute, based on the general rules of statutory construction set forth above, the Court finds that (c)(1) is unambiguous.

cured "by a security interest in real property that is the debtor's principal residence ..." under 11 U.S.C. Section 1322(b)(2).

### B.

■ Because the language of Section 1322(c)(1) is clear and unambiguous, the Court must follow the directive of Congress as set forth in the statute. The right to cure under subsections (b)(3) and (5) lasts **"until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law."** 11 U.S.C. Section 1322(c)(1). "Applicable nonbankruptcy law" means exactly that. Such language may encompass state and/or federal law depending on the particular Bankruptcy Code provision the Court is considering. *See Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (The Supreme Court analyzed the "applicable non-bankruptcy law" language in Section 541(a)(1) and determined that in that provision the "applicable nonbankruptcy law" encompassed both federal and state law.); *Resolution Trust Corp. v. Cityfed Fin. Corp.,* 57 F.3d 1231, 1238 (3d Cir.1995) (language "applicable nonbankruptcy law" encompasses any relevant nonbankruptcy law); *Drewes v. Schonteich,* 31 F.3d 674, 676 (8th Cir.1994) (the court can look to both state and federal nonbankruptcy law under the language of "applicable nonbankruptcy law"); *Vienna Park Properties v. United Postal Savings Ass'n (In re Vienna),* 976 F.2d 106 (2d Cir. 1992) (Virginia law constituted "applicable nonbankruptcy law," within the meaning of provision of the Code [Section 552(b) ] stating that security interest extends to rents acquired by estate after commencement of case to the extent provided by security agreement and by "applicable nonbankruptcy law" where properties were located in Virginia.). In some instances "applicable nonbankruptcy law" may include federal law. *Patterson,* 504 U.S. at 758, n. 2, 112 S.Ct. at 2247 (The Supreme Court cites numerous examples such as Sections 1125(d), 108(a), 108(b), and 541(c)(2) with supporting case

law.). In other instances Congress may limit the "applicable nonbankruptcy law" to mean only "state law". *Id.,* 504 U.S. at 758, 112 S.Ct. at 2246 (Examples include Sections 109(c)(2), 522(b)(1), 523(a)(5), 903(1), 1145(a) and 362(b)(12).).

■ Section 1322(c)(1) does not limit "applicable nonbankruptcy law" to state law; thus, applicable state and nonbankruptcy federal law may both apply. However, foreclosure of real property is governed by state law, and a determination of when such property is "sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law" is determined under state law. *See In re McKinney,* 174 B.R. 330, 333 (Bankr.S.D.Ala.1994) ("There is no federal foreclosure law and therefore the court's starting point in determining a mortgagor's status vis á vis a foreclosed mortgage is state law.... Alabama foreclosure law controls the rights of mortgagors and mortgagees unless clearly and manifestly displaced by federal law."). In the case at bar, therefore, Alabama law is the only "applicable nonbankruptcy law."

### C.

■ Under Alabama law, the mortgagee has legal title to the real property subject to the mortgagor's equitable right of redemption. *See* Ala.Code Section 35–10–26 (1975); *BancBoston Mortgage v. Gobble–Fite Lumber,* 567 So.2d 1337 (Ala.1990); *Bailey Mortgage Company v. Gobble–Fite Lumber,* 565 So.2d 138 (Ala.1990); *Bank of Powell v. Peoples Bank,* 503 So.2d 845 (Ala.1987); *Trauner v. Lowrey,* 369 So.2d 531 (Ala.1979); Grover S. McLeod, *Equitable Remedies and Extraordinary Writs in Alabama* § 40.03 (2nd Ed.1994) ("The mortgage on being recorded passes legal title to the mortgagee and the mortgagor is left with the equity of redemption.") (citing *Trauner,* 369 So.2d 531 (1979)). Upon a foreclosure sale of the mortgaged property the legal title vests in the purchaser. *See* Ala.Code Section 35–10–1 (1975).[8] The purchaser of validly foreclosed property

---

8. Section 35–10–1 of Alabama Code (1975) provides in pertinent part: "Where a power to sell lands is given to the grantee in any mortgage.... a conveyance of the lands sold under such power of sale to the purchaser at the sale, executed by the mortgagee ... vests the legal title thereto in such purchaser."

holds legal title to the property and is the absolute owner. *In re McKinney*, 174 B.R. at 334 ("After the foreclosure, there is a merger of legal and equitable titles.") (citing *Tompkins v. United States*, 946 F.2d 817 (11th Cir.1991); *In re Detter*, 141 B.R. 221, 222 (Bankr.M.D.Ala.1991) (citing Ala.Code § 35–10–5) (1975); *Wallace v. Beasley*, 439 So.2d 133, 136 (Ala.1983)); *Barnett & Jackson v. McMillan*, 176 Ala. 430, 58 So. 400, 401 (1912)).

■■■■■■ Upon a foreclosure sale the mortgagor's equitable right of redemption ends. *See F.D.I.C. v. Morrison*, 747 F.2d 610 (11th Cir.1984); *In re McKinney*, 174 B.R. at 334 ("After the foreclosure sale, the equity of redemption under the mortgage is completely extinguished. There is no further mortgage to sustain such an equitable right.") (citing *Allison v. Cody*, 206 Ala. 88, 89 So. 238 (1921)). The purchaser's legal title is subject to the mortgagor's one year statutory right of redemption from the date of the foreclosure sale. *See* Ala.Code Section 6–5–248(a) and (b)(1975), *supra* note 3; *In re Ragsdale*, 155 B.R. at 586, n. 6 ("It is said that foreclosure sale held pursuant to Alabama law vests legal title in the purchaser. *Jordan v. Ogden*, 237 Ala. 626, 188 So. 235 (1939). However, this 'vesting' of title remains subject to the redemption statute, so a better statement would be that the purchaser at a foreclosure sale acquires an interest contingent on the former owner's election not to exercise his right to redeem."); *In re Detter*, 141 B.R. at 222 ("The [purchaser at the foreclosure sale] has absolute ownership of the residence subject to the debtors' statutory right to redeem the property."). However, this statutory right of redemption is only available to a mortgagee who has vacated the premises within ten days after demand for possession by the mortgagor; otherwise, the statutory right of redemption is lost. *See* Ala.Code § 6–5–251 (1975); *In re Ragsdale*, 155 B.R. at 587, n. 5; *Smith*, 170 B.R. at 710.

■■■■ The description of the conveyance of the lands sold at the foreclosure sale vesting legal title in the purchaser, Alabama Code (1975) Section 35–10–1, and the right to redeem after the property is sold, Alabama Code (1975) Section 6–5–248, convinces the Court that Alabama law treats the foreclosure sale as complete when the foreclosure deed is executed. *Garrison v. Dickerson*, 631 So.2d 255 (Ala.Civ.App.1993). "Sale or Sold" is defined to mean the foreclosure sale. Alabama Code (1975) Section 6–5–247(1).

### D.

■■■ In the case at bar RHCDS held a foreclosure sale on May 19, 1995. If the right of redemption is not lost via a ten-day demand for possession, the debtor could redeem the property until May 18, 1996. The debtor makes no allegation that the foregoing sale was conducted in any manner contrary to the mortgage or Alabama law. At the time of the actual sale, the debtor lost the ability to reinstate the mortgage, decelerate the indebtedness and resume payments according to the mortgage contract's pre-default terms under 11 U.S.C. Section 1322(b). This is the result mandated by Congress in the Reform Act under Section 1322(c)(1). Congress has adopted the date of the foreclosure sale as the termination date and in so doing has limited the debtor's ability to save her home in a Chapter 13 case and obtain a fresh start.

This Court questions the wisdom of the new statutory provision just as Chief Judge Mitchell questioned those cases prior to the Reform Act, such as *In re Glenn*, 760 F.2d 1428 (6th Cir.1985), which adopted the "foreclosure sale" as the cut off to the right to cure. The *Glenn* decision expressly stated that "[t]he event we choose as the cut-off date of the statutory right to cure defaults is the sale of the mortgaged premises." *In re Glenn*, 760 F.2d at 1435. The Reform Act has adopted this bright line test based on time, just as the *McKinney* decision did. First the *Glenn* decision, and now Section 1322(c)(1), abrogates the need of courts to analyze the state property rights of the debtor in the property to determine when a cure is available. *Id.*, at 1436. This result is not in accord with the public policy behind chapter 13 and behind the Bankruptcy Code as expressed in Section 541. In Alabama the right of redemption is an interest in property created by state law, and in an effort to give

debtor's a chance to save their homes, the debtor should be able to decelerate the indebtedness and reinstate the mortgage as long as the debtor has a property right in the property. This is in accord with the broad right to cure as set forth in *In re Hoggle.* See *In re Hart,* 184 B.R. 849 (Bankr. M.D.Fla.1995).

Section 1322(c)(1) does not abrogate the right of the debtor to cure the default under Alabama law after a foreclosure sale through her statutory right of redemption, assuming the debtor acted in compliance with the Alabama Code. Thus, after the foreclosure sale the only way the debtor can "cure" the default is to exercise her statutory right of redemption through a lump sum payment which includes the principal, interest, and certain other charges. *In re McKinney,* 174 B.R. at 334 (citations omitted). Under Section 1322(c)(1), a pre-petition foreclosure sale will almost always result in a debtor losing her home. If a debtor has sufficient funds to make such a lump sum payment, the debtor is likely not to be in a financial crisis to require the filing of a petition.

### Conclusion

Section 1322(c)(1) limits the rights of homeowners to keep their homes and to pay the mortgage debt through Chapter 13 plans. This Court is not free to deviate from the clear and unambiguous language of the statute. Therefore, because there has been a pre-petition foreclosure sale of the real property in question, Section 1322(c)(1) prohibits the debtor from reinstating the mortgage and curing the default as set forth in the debtor's plan. The debtor's plan does not provide adequate protection to RHCDS as the debtor seeks to retain possession of the homestead and pay the mortgage over time. Under the facts, the plan is not confirmable with this provision in it. Thus, the debtor has not shown that she can successfully reorganize. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (debtor must have a plan "in prospect"). The debtor has not sustained her burden of proof under Section 362(g)(2). The Court finds that "cause" exists and relief from the automatic stay is due to be granted under Section 362(d)(1). As the Court finds that relief from the stay is due to be granted, the motion for summary judgment is moot.

Therefore, pursuant to the findings of fact and conclusions of law as set forth above, and for good cause found, it is ORDERED by the Court that relief from the automatic stay is GRANTED.