### In re Daniel Paul STEPHENS, and Donna Louise Stephens, Debtors.

### M.C. SCHINCK, Movant,

### v.

### Daniel Paul STEPHENS, and Donna Louise Stephens, Respondents.

### Bankruptcy No. 98–10174.

United States Bankruptcy Court, D. Maine.

June 8, 1998.

George W. Kurr, Jr., Logan, Kurr & Hamilton, Bangor, ME, for Movant.

Mark A. Perry, Archer, Perry & Jordan, Bangor, ME, for Respondents.

Peter C. Fessenden, Brunswick, ME, for Chapter 13 Trustee.

### *Memorandum of Decision*

JAMES B. HAINES, Jr., Chief Judge.

Before me on a stipulated record is MC. Schtick's [hereinafter "Schinck"] motion for relief from stay. Schinck seeks relief so that he, as foreclosing mortgagee, may cause the sheriff to evict Chapter 13 debtors, Daniel and Donna Stephens [hereinafter "Stephenses"] from their residence, the mortgaged

premises. For the reasons set forth below, I conclude that relief from stay will issue.[1]

## BACKGROUND

### Procedural Background

The Stephenses commenced a Chapter 13 case on February 6, 1998. Schinck filed a motion for relief from stay shortly thereafter, seeking to oust the Stephenses from property in Hermon, Maine.[2] At the preliminary hearing on Schinck's motion, the parties agreed to submit a stipulated record and to have the matter decided after briefing.

### The Facts of the Matter

The Stephenses purchased unimproved real estate in Hermon, Maine from Schinck on April 1, 1992. Schinck took back, and duly recorded, a note and mortgage. The Stephenses built a house and garage on the property.

Subsequently, the Stephenses defaulted on their mortgage obligations and Schinck undertook to foreclose on the property, availing himself of Maine's "strict foreclosure" procedure.[3] In accordance with statutory requirements, Schinck effected sheriff's service of a "Notice of Foreclosure" on the Stephenses on December 12, 1996.

The Stephenses' one-year redemption period expired on December 12, 1997. They concede that during that year they made no payments on the mortgage note, the insurance lapsed, and real estate taxes, already in arrears, continued to accrue. To protect his interest in the property, Schinck paid the real estate taxes and secured insurance for the premises. When the redemption period ran out, Schinck commenced a forcible entry and detainer action against the Stephenses,

obtaining a writ of possession, which was served on the Stephenses on February 2, 1998. The Stephenses filed for Chapter 13 protection four days later.

### Discussion

Schinck asserts that the Stephenses' rights in the real property expired prior to the filing of their Chapter 13 petition and, therefore, that they were mere trespassers on the property at bankruptcy. Because the Stephenses' rights in the realty terminated when the redemption period ran, he contends, rights in the real property are not within the Stephenses' bankruptcy estate.

The Stephenses oppose Schinck's motion. As their only hope, they invoke § 1322(c)(1), arguing that federal law provides them an enduring right to cure their mortgage defaults under a Chapter 13 plan and save their home.

### Determining the Stephenses' Interest in the Property

#### A. The General Rule

▪ Generally speaking, state law determines the nature and extent of a party's property interest for the purposes of Code provisions. *See* 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 541.LH[3][a] (15th ed.1997); *see also Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). The Code determines what property becomes property of the bankruptcy estate, but it does not, routinely, create or enhance prop-

---

1. This memorandum of decision sets forth conclusions of law in accordance with Fed. R.Bankr.P. 7052 and Fed.R.Civ.P. 52. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101, *et seq.*

2. Schinck does not dispute that he must obtain relief from stay before he can proceed to wrest possession of the Hermon property from the Stephenses, even though the premise of his motion is that the property never became property of the bankruptcy estate. *See* §§ 362(a)(1), (2), (4), (5);

§ 541; *see also In re Simcock*, 152 B.R. 7, 9–10 (Bankr.D.Me.1993). *Compare* § 362(a)(3) (staying "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate").

3. The process is codified at 14 M.R.S.A. § 6203(2) (West 1980 & Supp.1997). The statute is entitled "Foreclosure without possession" but "strict foreclosure" is its common appellation; the one I will use going forward. The strict foreclosure procedure is discussed at length *infra*.

erty rights. *See* 5 *Collier on Bankruptcy, supra,* ¶ 541.LH[3][a]. Therefore, absent some overriding Code provision, the particulars ·of Maine's foreclosure law define the Stephenses' and Schinck's rights for the purpose of, in this case, § 362 and § 1322. *See Butner,* 440 U.S. at 54, 99 S.Ct. at 917 (entitlement to rents post-bankruptcy petition and pre-foreclosure sale); *In re Sims,* 185 B.R. 853, 858 (Bankr.N.D.Ala.1995) (interests of mortgagor); *In re Simcock,* 152 B.R. at 9 (interests of a mortgagor and mortgagee); *In re Cormier,* 147 B.R. 285, 289 (Bankr. D.Me.1992) (interests of mortgagor and mortgagee); *see also* 5 *Collier on Bankruptcy, supra,* ¶ 541.LH[3][a] ("[T]he existence and nature of the debtor's interests in property, and of his or her debts, are determined by nonbankruptcy law.").[4]

### B. *An Exception to the General Rule*

Before proceeding to a discussion of § 1322(c)(1) as it relates to Maine's strict foreclosure law, I must address § 1322(c)(1) as it impacts the teachings of *In re Cormier.*

"Notwithstanding subsection (b)(2)[5] and applicable nonbankruptcy law," subsection (c)(1) provides that:

a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3)[6] or (5)[7] of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law[.]

§ 1322(c)(1).

Thus, enactment of § 1322(c)(1) statutorily overruled *In re Cormier* 's holding that pre-

filing expiration of the mortgagor's state law right to redeem left the debtor/mortgagor without property rights in residential real estate to bring to the bankruptcy estate. Under *In re Cormier* the debtor could not employ § 1322(b)(5)'s cure provisions whether or not a foreclosure sale had occurred. *See* 147 B.R. at 294. *Cormier* stated: "The Bankruptcy Code does not provide debtors any greater rights in real property than they hold under state law at the time that they file their petition." 147 B.R. at 289.

On its face, § 1322(c)(1) has altered the equation, providing a supplemental, federal, right that enhances state law rights. The statute now grants debtors the opportunity to cure home mortgage defaults up to the foreclosure sale in a civil foreclosure action,[8] whether or not state law principles would have extinguished the˚ debtor's real property rights in the period preceding bankruptcy.

It remains for me to determine how, if at all, § 1322(c)(1) impacts the Stephenses' rights under §§ 1322(b)(3) and (5), given the pre-petition progress of Schinck's strict foreclosure.

### *Statutory Construction at the Intersection of Maine's Strict Foreclosure Law and § 1322(c)(1) of the Bankruptcy Code*

#### A. *General Principles*

In construing § 1322(c)(1) I "begin with the words of the statute, and [I] approach them with an understanding that [my] role is not to set public policy, but, rather, to discern the legislature's will." *Abbott v. Bragdon,* 107 F.3d 934, 938 (1st Cir.1997) (con-

---

**4.** Maine being a title theory state, the Stephenses' interest in the Hermon property under the mortgage were, at their height, limited to a right of possession and the right of redemption at equity. *See Duprey v. Eagle Lake Water & Sewer Dist.,* 615 A.2d 600, 602 (Me.1992); *see also In re Simcock,* 152 B.R. at 9 (quoting *In re Cormier* ); *In re Cormier,* 147 B.R. at 290.

**5.** Subsection (b)(2) of § 1322 allows for the modification of secured claims *except* those for which the only security is the debtor's principal residence. § 1322(b)(2).

**6.** Section (b)(3) of § 1322 permits a plan to "provide for the curing or waiving of any default." § 1322(b)(3).

**7.** Section (b)(5) of § 1322 allows the plan to "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due," notwithstanding the general prohibition against modifying a claim secured by a debtor's principal residence. § 1322(b)(5).

**8.** Civil foreclosure is also often dubbed judicial foreclosure. Maine's subchapter governing this process is entitled "Foreclosure Proceedings by Civil Action," *see* 14 M.R.S.A. § 6321, *et seq.* (West 1980 & Supp.1997), so I refer to it as civil foreclosure. I discuss Maine's civil foreclosure statute at length *infra.*

struing the American's with Disabilities Act), *cert. granted* —— U.S. ——, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997). *See also Tupper v. United States*, 134 F.3d 444, 446 (1st Cir. 1998) ("It is tautological that, when asked to interpret a statute, a court first looks to the text of that statute."); *accord Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 857 (1st Cir.1998).

■ Though statutory construction can draw courts to the dimly lit passages of legislative history [9] or analogous enactments, my course is illuminated by § 1322(c)(1)'s express terms. Congress included a trail marker in the statute's text, extending § 1322(c)(1)'s federal cure rights up to the time of the "foreclosure sale that is conducted in accordance with applicable nonbankruptcy law." With this phrase Congress has, in effect, directed that I look to the state law for the meaning of "foreclosure sale." *See In re Sims*, 185 B.R. at 865.[10]

### B. *Principles Applied*

■ Maine has two forms of non-consensual foreclosure that Schinck, as mortgagee,

---

[9] Part of the amendments wrought in the Reform Act of 1994, the House Report articulates the impetus and object of § 1322(c)(1):

> Section 1322(b)(3) and (5) of the Bankruptcy Code permit the debtor to cure defaults in connection with a chapter 13 plan, including defaults on a home mortgage loan. Until the Third Circuit's decision in *Matter of Roach*, 824 F.2d 1370 (3d Cir.1987), all of the Federal Circuit Courts of Appeal had held that such right continues at least up until the time of the foreclosure sale. *See In re Glenn*, 760 F.2d 1428 (6th Cir.1985), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); *Matter of Clark*, 738 F.2d 869 (7th Cir.1984), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). The *Roach* case, however, held that the debtor's right to cure was extinguished at the time of the foreclosure judgment, which occurs in advance of the foreclosure sale. This decision is in conflict with the fundamental bankruptcy principle allowing the debtor a fresh start through bankruptcy.
>
> This section of the bill safeguards a debtor's rights in a chapter 13 case by allowing the debtor to cure home mortgage defaults at least through the completion of a foreclosure sale under applicable nonbankruptcy law. However, if the State provides the debtor more extensive "cure" rights (through, for example, some later redemption period), the debtor would continue to enjoy such rights in bankruptcy....

H.R.Rep. No. 103–835, at 52 (1994). As of the time of the House Report, the First Circuit had not addressed the interaction of Chapter 13's cure provisions and Maine's civil foreclosure procedure, which, unlike those of other states, provides a post-judgment, pre-sale redemption period. *See In re Cormier*, 147 B.R. at 290 & n. 29.

Though this legislative history does not weigh in my decision, it is worth noting that there are troublesome gaps between the record's articulation of § 1322(c)(1)'s purpose and effect and the truncated statutory language. *See McCarn v. WyHy Fed. Credit Union (In re McCarn)*, 218 B.R. 154, 160–61 & n. 5 (10th Cir. BAP 1998) (noting inconsistency in the legislative history of § 1322(c)(1) and declining an invitation to rely on the report to determine a debtor's § 1322(c)(1) cure rights).

[10] I am well aware that "state law" is but a subset of "applicable nonbankruptcy law." *See Patterson v. Shumate*, 504 U.S. 753, 758 & n. 2, 112 S.Ct. 2242, 2246 & n. 2, 119 L.Ed.2d 519 (1992). However, aside from state law, there is no other body of nonbankruptcy law to which to look in connection with the issues before me today. I agree with the conclusion of *In re Sims*:

> Section 1322(c)(1) does not limit "applicable nonbankruptcy law" to state law; thus, applicable state and nonbankruptcy federal law may both apply. However, foreclosure of real property is governed by state law, and a determination of when such property is "sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law" is determined under state law.

185 B.R. at 865.

Though other courts have concluded the contrary, *see In re McCarn*, 218 B.R. at 160–62 (denying the necessity of inquiring into the elements of a sale under state foreclosure law because § 1322(c)(1) is not ambiguous, but undertaking the inquiry nevertheless), I see no way of construing § 1322(c)(1) without looking to state foreclosure law. This course is dictated by the absence of a definition of "foreclosure sale" in § 1322(c)(1) or the Code, and by the variations in foreclosure forms from state to state making it impossible to arrive at a "ordinary and conventional" definition. *But see United States v. L.R. Foy Constr. Co., Inc.*, 300 F.2d 207, 210 (10th Cir.1962) (observing that if the statute does not define a term the court "must assume that the term was used in its ordinary and conventional sense."); *accord Sullivan v. United States*, 348 U.S. 170, 171–72, 75 S.Ct. 182, 183–84, 99 L.Ed. 210 (1954).

My approach accords with the reasoning of courts that look to the requisite elements of a civil foreclosure sale under state law to determine the moment that a foreclosure sale has been "conducted in accordance with applicable nonbankruptcy law" for the purposes of § 1322(c)(1). *See e.g. In re Rambo*, 199 B.R. 747, 751 (Bankr.W.D.Okla.1996). *See* discussion *infra* note 16.

could utilize in foreclosing the Stephenses' interests in real estate: civil foreclosure and strict foreclosure.[11] The latter is decidedly different from the former in ways critical to § 1322(c)(1)'s application.

### 1. *Maine's Civil Foreclosure Statute*

Maine's civil foreclosure law, indisputably "applicable nonbankruptcy law" under § 1322(c)(1), requires that the mortgagee file a complaint in the appropriate state court, record it in the applicable registry of deeds, and serve all parties in interest. *See* 14 M.R.S.A. § 6321 (West Supp.1997). The court determines whether or not there has been a breach of condition warranting a judgment of foreclosure and sale. *See id.* § 6322. If the mortgagee succeeds, the mortgagor's 90 day redemption period commences running when judgment enters. *See id.*[12] Absent redemption, at the end of the 90–day period the mortgagor's rights in the real property terminate. *See id.* § 6323; *In re Cormier,* 147 B.R. at 290. The mortgagee must then commence three successive weekly publications of the foreclosure sale within 90 days after the redemption period's expiration. The foreclosure sale must be held no less than 30 and no more than 45 days from the date of first publication. *See* § 6323. The property must be sold to the highest bidder, though the mortgagee may assume this role. *See id.*

Any resulting deficiency may be assessed against the mortgagor only with court-issued execution. *See id.* § 6324. If the mortgagee is the high bidder, the deficiency is determined using the fair market value at the time of the public sale. *See id.* Surplus foreclosure sale proceeds go to the mortgagor. *See id.*

**11.** Maine law also has "private sale foreclosure" which is only available to mortgagees of certain business property. *See* 14 M.R .S.A. § 6203–A (West Supp.1997). Section § 6201 also provides for foreclosure by possession when the mortgagor consents, *see id.* § 6201(2) (West 1990 & Supp.1997), or when entry is not opposed. *See id.* § 6201(3) (West Supp.1997).

**12.** Mortgages executed prior to October 1, 1975, have a statutory one year period of redemption. *See id.*

### 2. *Maine's Strict Foreclosure Statute*

Strict foreclosure, employed by Schinck, is a bird of a different feather. Because it is an uncommon procedure, seldom invoked, I quote the key statutory provisions at length:

### § 6203 Foreclosure without possession

If, after breach of the condition, the mortgagee or any person claiming under him is not desirous of taking and holding possession of the premises, he may proceed for the purpose of foreclosure in ... the following mode[ ].

. . . .

**2. Service of notice.** He may cause an attested copy of such notice to be served on the mortgagor or mortgagors, or in the case of any recorded transfer or transfers of the mortgaged property since the giving of the mortgage, on the record holder or holders of the title of the mortgaged property at the time of the service of said notice, if he lives in the State, by the sheriff of the county where the mortgagor or the record holder of the title resides, or his deputy, by delivering it to him in hand or leaving it at his last and usual place of abode; and cause the original notice and the sheriff's return thereon to be recorded within 30 days after such service. . . .

§ 6203.

### § 6204 Redemption in one year

The mortgagor or person claiming under the mortgagor may redeem the mortgaged premises within one year after the first publication or the service of the notice mentioned in section 6203, and if not so redeemed, *the mortgagor's right of redemption is forever foreclosed.*

*Id.* § 6204 (West Supp.1997) (emphasis added).[13]

**13.** This section continues:

The mortgagor and mortgagee may agree upon any period of time not less than one year in which the mortgage is forever foreclosed. If made, this agreement must me inserted in the mortgage and is binding on the parties, their heirs, legal representatives and assigns and applies to all the modes of foreclosure of mortgages on real estate.

The mortgagor or those claiming under the mortgagor have the right to redeem the mortgaged premises from any and all sales of the

**§ 6204–B. Disposition of proceeds of sale after foreclosure**

This section governs the disposition of proceeds from the sale of real estate acquired by foreclosure under section[ ] ... 6203.

**1. Amounts retained from sale.** If the mortgagee sells all or any part of the real estate to a bona fide purchaser, within 2 years after the redemption period expires, the mortgagee may retain the [amount of the outstanding obligation, interest, costs, and expenses as] ... determined as of the date of the sale....

**2. Accounting and surplus.** The mortgagee shall provide to the mortgagor and any interested party a written accounting of each sale or sales and the amounts retained under subsection 1. If there is a surplus, the mortgagee shall also make a good faith written determination of who is entitled to the surplus remaining after deducting the amounts retained under subsection 1.

. . . .

**4. Sales later than 2 years after the expiration of redemption period.** A mortgagee is not required to provide the accounting or pay any surplus obtained from any sale of part or all of the real estate that occurs more than 2 years after the redemption period expires.

mortgaged premises under and by virtue of authority and power contained in the mortgage or from any sale of the mortgaged premises under or by virtue of a separate instrument executed at or about the same time with the mortgage, and being a part of the same transaction, by paying or tendering to the mortgagee or those claiming under the mortgagee as appears by record at the registry of deeds where the mortgage is properly recorded, the debt, interest, costs of foreclosure and other obligations provided in the mortgage, at any time within one year from the date of the sale. . . .

The acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of any mortgage of real property, of anything of value to be applied on or to the mortgage indebtedness by the mortgagor or any person holding under the mortgagee constitutes a waiver of the foreclosure, unless an agreement to the contrary in writing is signed by the person from whom the payment is accepted. . . . The receipt of income from the mortgaged premises, by the mortgagee or the mortgagee's assigns while in possession of

. . . .

*Id.* § 6204–B.[14]

3. *The Contrast*

Thus, civil foreclosure and strict foreclosure are two distinct procedures, running on different statutory schedules, with differing requirements. At various stages within each procedure, different rights attend the positions of mortgagees and mortgagors.

Though the cases are not numerous, the Maine Supreme Judicial Court has articulated the significant distinctions between the foreclosure forms. These distinctions relate to the role of the sale, if any, and the prescription for treating sale proceeds and any surplus or deficiency.

■ Strict foreclosure in Maine, the court has noted, does "not involve a sale of the mortgaged premises as part of the procedure leading to extinguishment of the mortgagor's interest." *Atlantic Oceanic Kampgrounds, Inc.,* 473 A.2d at 886. *Under strict foreclosure a sale need not ever take place* because, "[i]n a strict foreclosure proceeding, the law does not require the mortgagee, now legal and equitable title holder, to sell the property to effectuate foreclosure." *Id.* at 888 (Glassman, J. concurring). Once the one-year redemption period expires, "[t]he mort-

the premises, does not constitute a waiver of the foreclosure proceedings of the mortgage on such premises.

The mortgagee and the mortgagor may enter into an agreement to allow the mortgagor to bring the mortgage payments up to date with the foreclosure process being stayed as long as the mortgagor makes payments according to the agreement. If the mortgagor does not make payments according to the agreement, the mortgagee may, after notice to the mortgagor, resume the foreclosure process at the point at which it was stayed.
*Id.*

14. Though an unusual state law, this form of foreclosure is still utilized (and litigated) in Maine, though not frequently. The Maine Supreme Court most recently considered it in the context of a will revocation contest. *See Associates Commercial Corp. v. Chandler,* 710 A.2d 262 1998 ME 116 (1998); *see also Atlantic Oceanic Kampgrounds, Inc. v. Camden Nat'l Bank,* 473 A.2d 884 (Me.1984) (lengthy consideration of strict foreclosure).

gagee is free to do with the property as he wishes." *Id.*

Using strict foreclosure, Schinck is "under no duty to generate proceeds by offering the property for sale." *Id.* at 887 (majority). Though he is under a § 6204–B duty to account for any sale held within two years of the expiration of the Stephenses' period for redemption, whether or not a sale would take place is left entirely to Schinck's discretion. Schinck "acquired title to the real estate [on December 12, 1997]; any subsequent sale would be a sale of property which had become absolutely owned by [Schinck]." *Pierce v. Northeast Bank of Westbrook,* 381 A.2d 667, 669 (Me.1978). And two years after the expiration of the Stephenses' redemption rights, Schinck will have no duty to account for any proceeds, and potential surplus, a sale might generate. *See* § 6204–B.

In contrast, *in a civil foreclosure a public sale is inevitable:* the statute mandates it. *See* § 6323. The mortgagee must conduct a foreclosure sale. Furthermore, accounting to the court and the mortgagor is mandatory and the mortgagee's rights to any proceeds and a deficiency claim are delimited.[15] Such responsibilities are absolute and unavoidable.

I echo the conclusion of the Maine Supreme Court when it succinctly distinguished strict foreclosure and civil foreclosure: "it is beyond dispute that a sale following strict foreclosure is not a sale 'pursuant to a foreclosure under [title 14].' " *Atlantic Oceanic Kampgrounds, Inc.,* 473 A.2d at 886 (construing § 6402–B's predecessor). This conclusion leads to the determination that the foreclosure process used by Schinck did not involve a "foreclosure sale" under Maine law.[16]

Because the rights and interests of mortgagees and mortgagors under Maine's strict foreclosure procedures are determined without a "foreclosure sale," the federal law extension of cure rights embodied in § 1322(c)(1) has no application to the dispute before me. Section 1322(c)(1) cannot aid the Stephenses. At the time of their bankruptcy filing they no longer held rights in the previously-mortgaged real estate.[17]

### Plainly Not Preemption

 The Stephenses argue that "[b]y its plain language, 11 U.S.C. § 1322(c)(1) preempts applicable non-bankruptcy law" and, thus, Maine's strict foreclosure statute. I cannot accept the proposition that § 1322(c)(1) operates to curtail the availability of strict foreclosure under Maine law.

An argument that § 1322(c)(1) contains clear evidence of a congressional intent to preempt Maine's strict foreclosure law is unsustainable. True, the federal statute now establishes extended federal cure rights in

---

**15.** For example, as discussed *supra,* if the mortgagee is the high bidder, a surplus or deficiency is computed with reference to the property's fair market value, rather than the amount of the successful bid. *See* § 6324.

**16.** This conclusion also places my analysis outside the judicial dialogue concerning the operative moment in a foreclosure process for determining when the mortgagee/debtor loses the right to cure pursuant to §§ 1322(b)(2), (3), and (5) after the enactment of § 1322(c)(1) *Compare In re Rambo,* 199 B.R. 747 (concluding that the completion of all the required steps of a foreclosure sale under state law determines when a sale is "conducted" for the purpose of § 1322(c)(1)) *with In re McCarn,* 218 B.R. 154 (holding that § 1322(c)(1) is not ambiguous, that the debtor's cure right terminates on the date of the foreclosure sale regardless of the intricacies of the state foreclosure sale process, and refusing to attach significance to the legislative record indicating that more extensive cure rights under state law persevere) *and In re Sims,* 185 B.R. 853 (offering an overview of opposing interpretations of the "critical point" for §§ 1322(b)(2), (3), and (5)

cure before the enactment of § 1322(c)(1), and concluding that § 1322(c)(1) adopted the "bright line" of the sale as the operative moment, irrespective of state laws that establish a different, even later, point at which the mortgagor's rights are extinguished).

**17.** If the Stephenses have any other rights vis-a-vis the Schinck mortgage, they are not rights in real property. Certainly, their right to an accounting and to a return of surplus proceeds endures until the two-year cutoff. That interest, albeit a contingent one, passed to the Stephenses' bankruptcy estate. However, that right is a personal property interest (a chose in action), not a right in the real estate. *See In re Simcock,* 152 B.R. at 9–10; *In re Cormier,* 147 B.R. at 290 & n. 23; *see also Duprey,* 615 A.2d at 602(discussing post-redemption period rights and automatic foreclosure of sewer lien); *Martel v. Bearce,* 311 A.2d 540, 543 (Me.1973)(discussing post-redemption period rights and automatic foreclosure of tax lien).

Chapter 13 bankruptcy proceedings, notwithstanding less generous state rights in residential mortgage foreclosures accomplished by foreclosure sales. However, as the preceding discussion has demonstrated, by its terms § 1322(c)(1) does not apply to the strict foreclosure process that Schinck employed. Nor is there a meaningful conflict between the availability of this foreclosure method to Maine mortgagees and § 1322(c)(1)'s cure provisions. Maine's strict foreclosure is not "contrary law" to § 1322(c)(1). *Compare DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 29 (2d Cir.1982) (section 1322 cure provisions govern debtors' rights and "[a] state law to the contrary must fall before the Bankruptcy Code").

Therefore, I find no " 'clear' evidence of a congressional intent to preempt state law [nor am I] persuaded that the federal and state statutes, by their terms, cannot coexist." *Summit Inv. and Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995) (examining whether § 365(e) has a preemptive effect). *Accord United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 619 (1st Cir.1996)(quoting *Leroux* ). The Code's § 1322(c)(1) and Maine's § 6203(2) are two ships that pass in the night.

***Conclusion***

■ Section 1322(c)(1)'s limited scope does not operate to reinstate or recreate the Stephenses' "rights in the real estate after they ceased to exist under state law." *In re Cormier*, 147 B.R. at 294. Had Congress intended to extend § 1322(c)(1) cure rights to debtors using all forms of foreclosure, it could have passed broader legislation to accomplish that result. *See Butner*, 440 U.S. at 54, 99 S.Ct. at 917–18.[18] The Stephenses' rights are subject to the full force of Maine's strict foreclosure statute, for, as fashioned, § 1322(c)(1) has too short a hem to cover them.[19]

For the reasons set forth above, Schinck's motion for relief from stay will be GRANTED. A separate order shall issue forthwith.

---

18. I reiterate that my role in construing § 1322(c)(1) is not to set public policy. *See Abbott*, 107 F.3d at 938. Section 1322(c)(1) should not be extended to circumstances not clearly within its scope "simply because it may seem to [the court] that a similar policy applies, or upon the speculation that, if the legislature had thought of it, very likely broader words would have been used." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) *See also* Henry M. Hart, Jr. & Albert M. Sacks, *The Legal Process* 1172–1202 (William N. Eskridge, Jr. & Philip P. Frickey eds., 1994) (exploring problems facing courts when asked to apply statutes to disputes the nuances of which were not contemplated by the enacting legislators).

19. In the words of the fictional Willie Stark:

I can see what the law is like. It's like a single-bed blanket on a double bed and three folks in the bed and a cold night. There ain't ever enough blanket to cover the case, no matter how much pulling and hauling, and somebody is always going to nigh catch pneumonia. Hell, the law is like the pants you bought last year for a growing boy, but it is always this year and the seams are popped and the shankbone's to the breeze. The law is always too short and too tight for growing humankind. The best you can do is do something and then make up some law to fit and by the time that law gets on the books you would have done something different.

Robert Penn Warren, *All the King's Men* 136 (First Harvest ed.1982).