**In re Darwin R. BEEMAN and Terry M. Beeman, Debtors.**

**Bankruptcy No. 99–10346–JMD.**

United States Bankruptcy Court, D. New Hampshire.

June 21, 1999.

Bruce R. Jasper, Elliott & Jasper, LLP, Newport, NH, for debtors.

Mark G. May, Mark G. May, P.C., Manchester, NH, for movant.

Lawrence P. Sumski, Amherst, NH, Chapter 13 Trustee.

## MEMORANDUM OPINION AND ORDER

J. MICHAEL DEASY, Bankruptcy Judge.

### I. BACKGROUND

Before the Court is a motion by the Bank of New York ("Bank") for relief from the automatic stay for the purpose of allowing the Bank to record a foreclosure deed and to evict Darwin and Terry Beeman (the "Debtors") from their residence. The basic facts in this case are undisputed and facially simple. On November 20, 1996, the Debtors granted a mortgage on their principal residence to the Bank for the purpose of securing a note. The Debtors thereafter defaulted, causing the Bank to foreclose upon their mortgage. The Bank was the successful bidder at the foreclosure auction, held on December 10, 1998. The Debtors filed a Chapter 13 petition on February 8, 1999, the sixtieth day following the date of the foreclosure auction. The Bank did not record the foreclosure deed before the Debtors filed their bankruptcy petition.

On May 26, 1999, this Court held a hearing on the Bank's motion for relief. At the hearing the Debtors testified that they had numerous telephone conversations with a representative of the Bank[1]

---

1. More precisely, the Debtors dealt with a representative of The Money Store, the mort- gagee of record. The Bank of New York is the trustee under a pooling and servicing

during the three months prior to the foreclosure auction and that the parties had orally reached a tentative workout agreement that was intended to prevent foreclosure. More specifically, the Debtors testified that the Bank's representative had stated on numerous occasions that the parties could reach a payment agreement that would avoid foreclosure. The Debtors testified that they had first come to such an agreement with the Bank's representative over the telephone during October of 1998. However, the Debtors testified that they were told not to send any money until they had received and signed a written agreement. Despite several promises from the Bank, the Debtors never received a written agreement. The Debtors eventually received a notice of foreclosure. The Debtors immediately contacted the Bank's representative, who told them not to worry about the notice since it was a form letter and not applicable to the Debtors in light of the oral workout agreement between the parties. According to the Debtors, the Bank's representative stated that she had not yet completed a written agreement and then agreed to a second agreement over the telephone. Again, according to the Debtors, they were to send no money until they received a written agreement, which the Bank's representative failed to send them. The Debtors testified that it was their understanding that the foreclosure would not occur due to the agreement they thought they had with the Bank.

No written agreement was ever sent to the Debtors and the foreclosure auction took place as originally scheduled on December 10, 1998. The Bank was the high bidder. After contacting the Bank immediately after the foreclosure auction, the Debtors were told by a second Bank representative that a denial of the workout agreement had been mailed to the Debtors on December 9, 1998, one day before the foreclosure. The Debtors subsequently spoke with the Bank's first representative, who, according to the Debtors, told them that the foreclosure should never have taken place and occurred due to her neglect. She advised the Debtors that they could refinance the property with a new mortgage at no more than they had been paying, and referred them to a third representative to discuss refinancing. After four to six weeks of discussions, the Debtors were advised that the Bank would not approve refinancing. The Debtors then filed this Chapter 13 proceeding. Since the filing of their Chapter 13 petition, the Debtors, with the agreement of counsel for the Debtors and the Bank, have paid the amount of the monthly mortgage payments to the Debtors' counsel to be held in escrow pending a resolution of the status of the foreclosure.

The Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. DISCUSSION

### A. The Parties' Positions

The Bank relies largely on *In re Hazleton,* 137 B.R. 560 (Bankr.D.N.H.1992) and *Barrows v. Boles,* 141 N.H. 382, 687 A.2d 979 (1996) to support its argument that, as of the petition date, the Debtors had no property interest in their residence that could have become property of the estate. The Bank argues that both of these cases hold, as a matter of federal and state law respectively, that a mortgagor does not possess either a legal or an equitable interest in the mortgaged property after the foreclosure auction. Consequently, the Bank argues that there was no estate property as of the petition date, and thus

agreement connected with the mortgage. For reasons of simplification, the term "Bank" is used in reference to both entities.

cause exists to lift the stay to allow recording of the foreclosure deed[2] and to seek eviction.

The Debtors argue that the *Hazleton* decision should not control this case because the analysis in *Hazleton* only considered the property rights of debtors under state and federal law, but not the rights of a trustee as a hypothetical bona fide purchaser of real property ("BFP") under 11 U.S.C. § 544(a)(3).[3] The Debtors point to the decision in *In re Burns*, 183 B.R. 670 (Bankr.D.R.I.1995). In *Burns*, the Chapter 13 debtors filed their petition after the foreclosure auction, but before the foreclosure deed was recorded. The court in *Burns* held that, pursuant to the trustee's strong-arm powers under § 544(a)(3), the filing of the bankruptcy petition before the recording of the foreclosure deed subordinated the rights of the purchaser at the foreclosure auction to the trustee. *See id.* at 671. The *Burns* court based its decision on the fact that Rhode Island is a race-notice jurisdiction. *See id.* The Debtors note that New Hampshire is also a race-notice jurisdiction. *See Amoskeag Bank v. Chagnon*, 133 N.H. 11, 14, 572 A.2d 1153 (1990). Thus, they argue that, under New Hampshire law, a BFP without notice has priority over a previous purchaser if the BFP records first. *See Moore v. Kidder*, 55 N.H. 488 (1875); *Brown v. Manter*, 22 N.H. 468 (1851). The Debtors contend that the *Hazleton* decision considered only the rights of a debtor, but not the rights of the trustee as a hypothetical BFP under § 544(a)(3). The Bank counters by arguing that the rationale of *Burns* does not apply because under New Hampshire law, a BFP would have notice of the Bank's properly recorded mortgage and would have a duty to investigate the status of the mortgage. Accordingly, the Bank contends that the

Debtors' reliance on the *Burns* decision is misplaced and that the *Hazleton* decision is determinative of its right to relief from the automatic stay.

## B. *In re Hazleton*

The *Hazleton* decision plays a central role in the parties' arguments and therefore warrants separate discussion. In *In re Hazleton*, Judge Yacos faced a situation similar to the instant matter. The case involved a mortgagee who conducted a foreclosure auction pre-petition but did not record the foreclosure deed before the mortgagor filed for bankruptcy under Chapter 7. The mortgagee sought relief from the stay. Judge Yacos first determined that the mortgagor-debtor had no state property rights as of the petition date because under New Hampshire law, a mortgagor loses his or her right of redemption once the foreclosure auction takes place. *See* RSA 479:18. Judge Yacos then concluded that the mortgagor-debtor held no federal interests as of the petition date and thus the property was not property of the estate. *See Hazleton*, 137 B.R. at 563 ("The Court holds that a foreclosure sale concluded pre-petition terminates any Federal interest of the debtor in the foreclosed upon real property. It therefore follows that the foreclosed property is not part of the debtor's estate...."). Because the relevant property was not property of the estate, Judge Yacos logically concluded that relief from the stay was not necessary. *See id.*

The Bank also relies upon a New Hampshire Supreme Court decision to support its argument that the Debtors' residence is not property of the estate. In *Barrows v. Boles*, the New Hampshire Supreme Court cited *Hazleton* for the proposition that a mortgagor does not retain legal or equita-

---

**2.** In actuality, the Bank would not need relief from the stay to record the foreclosure deed if its argument is correct since such action would be an act against property that, according to the Bank's argument, is not property of the estate. *See Hazleton* 137 B.R. at 563.

**3.** Unless otherwise noted, all section references hereinafter are to Title 11 of the United States Code.

ble interest in property once a foreclosure auction is held. *See Barrows,* 141 N.H. at 393, 687 A.2d 979. This observation was made in the context of deciding whether a party tortiously interfered with a mortgagor's contractual rights to rent from tenants when, after the foreclosure auction but before the sale was completed, the party told the tenants to pay rent to him rather than to the mortgagor. The Court decided that no such interference occurred because the mortgagor was not entitled to rent payments after the foreclosure auction.

At first blush, it appears that both the *Hazleton* and *Barrows* decisions support the Bank's argument that the Debtors' property is not property of the estate. However, legislative amendments to § 1322 of the Bankruptcy Code, made subsequent to the *Hazleton* decision, modify the result in *Hazleton* for Chapter 13 debtors by creating federal interests in certain circumstances.[4] The Court finds that § 1322, as amended, resolves the instant issue before it without the need to consider the Debtors' argument under *Burns* and § 544(a)(3).

### C. Section 1322(c)(1)

Section 1322 provides for, *inter alia,* the mandatory and permissive terms of a debtor's Chapter 13 plan. Sections 1322(b) and (c) provide, in pertinent part:

(b) Subject to subsections (a) and (c) of this section, the plan may—...

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...

(3) provide for the curing or waiving of any default ...

(5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due ...

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—

(1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is *sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law....*

11 U.S.C. §§ 1322(b) and (c) (emphasis added). In essence, §§ 1322(b) and (c) allow a Chapter 13 debtor to cure and reinstate a mortgage on the debtor's prin-

---

4. The Court notes, without deciding, that the Debtors may have held certain state law property interests as of the petition date due to the unique facts of this case. It appears that, pursuant to New Hampshire law, the Debtors may have a host of possible causes of action against the Bank that could potentially increase their state law rights in the subject property as of the petition date. *See LaBarre v. Shepard,* 84 F.3d 496, 498 (1st Cir.1996) (listing the following causes of action raised by a plaintiff in the context of considering a decision on appeal involving a foreclosure under New Hampshire law: (1) unfair and improper foreclosure; (2) breach of contract; (3) intentional misrepresentation; (4) fraud; and (5) unfair and deceptive trade practice under New Hampshire's Consumer Protection Act); *Prescott v. Jenness,* 77 N.H. 84, 88 A. 218 (1913) (stating that an agreement to extend the time to redeem past foreclosure is enforceable for reasons of equity, even if the mortgagor mistakingly believes that such an agreement exists when it does not, so long as no other rights have intervened); *Harper v. Healthsource New Hampshire, Inc.,* 140 N.H. 770, 775, 674 A.2d 962 (1996) (stating that every contract in New Hampshire imposes upon the contracting parties an implied duty of good faith and fair dealing). The Court will not consider these possible claims given the summary nature of a hearing on a motion for relief from the stay. *See Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 33 (1st Cir.1994) ("[A] hearing on a motion for relief from stay is merely a summary proceeding of limited effect, and ... a court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has a colorable claim to property of the estate.").

cipal residence up until the time "such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law." Section 1322(c)(1) was added to the Bankruptcy Code in 1994, as a part of the Bankruptcy Reform Act of 1994. Before 1994, there was some confusion as to when Chapter 13 debtors lost their right to cure and reinstate a home mortgage. Some courts had held that such a right was lost when a foreclosure auction was held. *See, e.g., Fed. Land Bank of Louisville v. Glenn (In re Glenn),* 760 F.2d 1428 (6th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); *In re Clark,* 738 F.2d 869 (7th Cir.1984), *cert. denied,* 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). However, in 1987, the Court of Appeals for the Third Circuit held that a Chapter 13 debtor's right to cure and reinstate a home mortgage was lost, pursuant to state law, upon entry of a foreclosure judgment, which occurred before the actual foreclosure auction. *See In re Roach,* 824 F.2d 1370 (3d Cir.1987). It is generally understood that Congress enacted § 1322(c)(1) in an effort to resolve this confusion and create a uniform standard. *See In re Crawford,* 232 B.R. 92, 95 (Bankr.N.D.Ohio 1999); *In re Tomlin,* 228 B.R. 916, 918 (Bankr.E.D.Ark.1999). This effort, however, has not achieved its goal of clarification.

There are generally two schools of thought with respect to § 1322(c)(1). One approach is to find that the language of § 1322(c)(1) is unambiguous and conclude that a Chapter 13 debtor's rights to cure and reinstate are cut off as of the date of the foreclosure auction. *See, e.g., McCarn v. WyHy Fed. Credit Union,* 218 B.R. 154, 161 (10th Cir. BAP 1998); *Crawford,* 232 B.R. at 96. The contrary approach is to find that the statutory language is ambiguous and thus turn to legislative history in an effort to determine the legislature's intent. Courts following the latter approach generally conclude that the statutory language is intended to cut off the debtor's right to cure and reinstate as of the point when a foreclosure sale is complete pursu-

ant to state law. *See Tomlin,* 228 B.R. at 919 (listing various decisions finding that the language of § 1322(c)(1) is ambiguous).

In interpreting a statute, the starting point is the statutory language. *See Arnold v. United Parcel Service, Inc.,* 136 F.3d 854, 857 (1st Cir.1998) (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)). If the statutory language is unambiguous, then a court's function is merely to apply the statutory language according to its unambiguous meaning. *See id.* at 858 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). If, however, the statutory language is ambiguous, then a court must turn to other sources, such as legislative history, in an effort to determine the legislature's intent. *See id.*

The Court finds that the language of § 1322(c) is unambiguous. Section 1322(c)'s language unambiguously provides that (1) state redemption law is preempted with respect to when a Chapter 13 debtor's rights to cure and reinstate a principal residence mortgage are cut off; (2) such cure and reinstatement rights end when a foreclosure sale process is complete; and (3) state foreclosure law determines when the foreclosure sale process ends.

Section 1322(c) begins with "[n]otwithstanding subsection (b)(2) and applicable nonbankruptcy law...." Thus, Congress unambiguously intended to preempt state redemption law by fixing the time when a Chapter 13 debtor's rights to cure and reinstate are terminated as when property "is sold at a foreclosure sale," regardless of whether state law terminates redemption rights at an earlier time. Of course, this begs the question of when property is "sold at a foreclosure sale."

Section 1322(c)(1) provides that a Chapter 13 debtor's cure and reinstatement rights end when the subject property "is sold at a foreclosure sale that is con-

ducted in accordance with applicable non-bankruptcy law." The Court finds that this language is not ambiguous and yields a plain meaning. By stating that a debtor's rights are cut off when a residence is *sold* at a foreclosure sale, the language envisions the completion of something; namely, the completion of a "sale" of property through foreclosure. The word "sale" is generally defined as the transferring of ownership and title regarding property to a buyer. *See Black's Law Dictionary* 1200 (5th ed.1979) (defining "sale" as "by which [the seller], in consideration of the payment or promise of payment of a certain price in money, transfers to [the buyer] the title and the possession of property"); *Merriam Webster's Collegiate Dictionary* 1031 (10th ed.1997) (defining "sale" as "the transfer of ownership and title to property from one person to another for a price"). Thus, the statutory language envisions a debtor's rights being terminated upon the completed transfer of title and ownership to a buyer through a foreclosure sale. Title and ownership generally pass through foreclosure upon the completion of a *process,* and not upon the occurrence of a single event such as a foreclosure auction. For example, under New Hampshire's power of sale regime, there are numerous steps that must be taken before a foreclosure sale is deemed complete and final.[5] In contrast, a foreclosure auction is a singular event, an event occurring as a part of the foreclosure sale process that does not normally result in a final transfer of ownership and title by itself. By deciding to hinge a debtor's cure and reinstatement rights on property being sold at a foreclosure sale, rather than the occurrence of a foreclosure auction, Congress has envisioned the cut-off time as occurring at the end of a process rather than at the end of one event within that process. The issue then becomes what law governs the question of when such a process is complete.

■ Congress did not define the term "foreclosure sale" under the Bankruptcy Code. Accordingly, when a foreclosure sale is complete turns on state law. This conclusion follows from the fact that § 1322(c)(1) modifies "sold at a foreclosure sale" with "that is conducted in accordance with applicable nonbankruptcy law." This language indicates that Congress intended state law to be determinative of when a foreclosure sale is complete. *See M.C. Schinck v. Stephens (In re Stephens),* 221 B.R. 290, 294 (Bankr.D.Me.1998) ("With this phrase Congress has, in effect, directed that I look to the state law for the meaning of 'foreclosure sale.' "). Thus, Congress has effectively preempted state redemption law in the context of determining which point in time a Chapter 13 debtor's rights to cure and reinstate are terminated, but has directed that state foreclosure law be used in determining that point in time. *See id.*

Because this Court concludes that the language of § 1322(c)(1) is unambiguous, it is not required to delve into relevant legislative history. However, the Court notes that consideration of the legislative history does not weaken its conclusion. Most courts have found the legislative history of § 1322(c)(1) to be equivocal at best. *See, e.g., McCarn,* 218 B.R. at 161 (stating that different portions of the legislative history appear contradictory); *Tomlin,* 228 B.R. at 919 (same); *Stephens,* 221 B.R. at 294 (same). The House Committee Report provides the following:

> This section of the bill safeguards a debtor's right in a chapter 13 case by allowing the debtor to cure home mortgage default at least through *completion*

---

5. For example, there must be adequate notice of the sale. *See* RSA 479:25. Also, title to the property does not pass to the purchaser until the foreclosure deed is recorded. *See* RSA 479:26. In addition, if the purchaser does not pay the balance of the purchase price according to the terms of the sale, then, at the option

of the mortgagee, the down payment will be forfeited and the sale will be considered void. *See id.* Finally, the mortgagee owes certain fiduciary duties to the mortgagor in connection with the foreclosure sale. *See Murphy v. Fin. Dev. Corp.,* 126 N.H. 536, 495 A.2d 1245 (1985).

of a foreclosure sale under applicable nonbankruptcy law. However, if the State provides the debtor more extensive "cure" rights (through, for example, some later redemption period), the debtor would continue to enjoy such rights in bankruptcy.

140 Cong.Rec. H10,769 (daily ed. Oct. 4, 1994) (emphasis added). This language suggests that a debtor's cure and reinstatement rights will be cut off only upon completion of all steps necessary to effectuate a foreclosure sale. However, Senator Grassley provided the following floor remarks: "Section 301 will preempt conflicting State laws, and permit homeowners to present a plan to pay off their mortgage debt until the foreclosure sale actually occurs." 140 Cong.Rec. S14,462 (daily ed. Oct. 6, 1994). Some courts interpret this language as implying that a debtor's cure and reinstatement rights terminate upon the occurrence of a foreclosure auction. See, e.g., Tomlin, 228 B.R. at 919. The legislative history is arguably in conflict with respect to exactly when a debtor's cure and reinstatement rights are terminated. Thus, there is no indication of a uniform congressional intent that contradicts this Court's conclusions. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 165, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (stating that when legislative history is found to be conflicting it "affords no definitive guide to the congressional understanding").

### D. Section 1322(c)(1) as Applied to the Instant Case

■ As discussed above, under New Hampshire law, title does not pass to the purchaser at a foreclosure auction until the foreclosure deed is recorded. See RSA 479:26. In addition, at the option of the mortgagee, a sale shall be void if the purchaser does not pay the balance of the purchase price according to the terms of the sale. See id. Thus, under New Hampshire law, a foreclosure sale will not be complete (i.e., final passage of title and ownership) until such events take place, notwithstanding the occurrence of a foreclosure auction. As of the petition date, the Bank had not recorded the foreclosure deed and therefore the foreclosure sale was not yet complete. Consequently, as of that date the Debtors retained their rights to cure and reinstate their mortgage pursuant to § 1322(c)(1). Thus, as of the petition date, the Debtors retained a federal interest that became property of the estate under § 541(a)(1). See Hazleton, 137 B.R. at 562 (explaining that the question of whether property of the estate exists necessitates examining whether any federal interests exist). Because the Debtors held a federal interest in the subject property as of the petition date, the automatic stay prohibits the Bank from recording the foreclosure deed or pursuing eviction of the Debtors unless this Court concludes relief should be granted. See § 362(a).

Based on this Court's analysis, the enactment of § 1322(c)(1) in 1994 statutorily reversed Hazleton's holding, as applied to Chapter 13 debtors.[6] Before 1994, when Hazleton was decided, there was some confusion as to when a Chapter 13 debtor's rights to cure and reinstate a home mortgage were cut off. However, since the enactment of § 1322(c)(1), this point has been fixed as of the completion of the foreclosure sale process, which, under New Hampshire's statutory power of sale procedure, occurs subsequent to the foreclosure auction. Thus, as applied to Chapter 13 debtors,[7] Hazleton's holding that a debtor lacks any federal interests in property subsequent to a foreclosure auction has been modified. Instead, pursuant to

---

6. Section 1322(c)(1) has no effect on Barrows, since that decision determined a mortgagor's rights pursuant to New Hampshire law and not federal bankruptcy law.

7. Because § 1322(c)(1) bestows federal rights only upon Chapter 13 debtors, this Court's conclusion that the Hazleton decision has been modified by § 1322(c)(1) only applies to debtors filing under Chapter 13.

§ 1322(c)(1), Chapter 13 debtors have a federal interest in their principal residences up until the completion of the foreclosure process. Because the automatic stay applies to such an interest, mortgagees must obtain relief from the stay before they may record a foreclosure deed or perform any other acts necessary to complete the foreclosure process in a Chapter 13 proceeding.

### E. Relief from the Stay is Denied

Section 362(d) provides the Bank with two possible avenues for obtaining relief from the stay. Section 362(d)(1) allows relief for cause, including the lack of adequate protection, while § 362(d)(2) allows relief if (1) the debtor lacks equity in the subject property, and (2) the property is not necessary to an effective reorganization. *See* § 362(d). According to the Debtors' Chapter 13 plan, their mortgage arrearage will be cured through their plan. In addition, testimony at the hearing revealed that, since the petition date, the Debtors have been paying the monthly mortgage payments to their counsel, who has held them in escrow. Thus, it appears that the Bank's interest in the subject property is adequately protected and there is no cause warranting relief from the stay. Moreover, it appears that the subject property is necessary in this case for the Debtors to effectively complete their Chapter 13 plan. Consequently, the Bank's motion for relief from the stay for the purpose of recording the foreclosure deed and seeking eviction of the Debtors is denied.

### III. CONCLUSION

For the reasons stated above, the Court denies the Bank's motion for relief from the automatic stay. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.